**Michigan Supreme Court**
**Lansing, Michigan**

# Opinion

Chief Justice:
Clifford W. Taylor

Justices:
Michael F. Cavanagh
Elizabeth A. Weaver
Marilyn Kelly
Maura D. Corrigan
Robert P. Young, Jr.
Stephen J. Markman

FILED JULY 23, 2008

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

No. 131942

CAPRESE D. GARDNER,

Defendant-Appellant.

BEFORE THE ENTIRE BENCH

CORRIGAN, J.

In this case, we consider the correct method for counting prior felonies under Michigan's habitual offender statutes, MCL 769.10, 769.11, 769.12, and 769.13. These statutes establish escalating penalties for offenders who are repeatedly convicted of felonies. This Court has ruled that the statutes imply that each predicate felony must arise from separate criminal incidents. *People v Preuss,* 436 Mich 714; 461 NW2d 703 (1990); *People v Stoudemire,* 429 Mich 262; 414 NW2d 693 (1987), mod by *Preuss, supra* at 739. Therefore, multiple felonies that arise from the same criminal incident or transaction count as a single felony under the habitual offender laws.

We conclude that the holdings of *Stoudemire* and *Preuss* directly contradict the plain text of the statutes. Therefore, we overrule these cases. The unambiguous statutory language directs courts to count each separate felony conviction that preceded the sentencing offense, not the number of criminal incidents resulting in felony convictions. Accordingly, defendant was properly sentenced and we affirm his sentences.

## I. FACTS AND PROCEDURAL HISTORY

In 2001, a jury convicted defendant, Caprese D. Gardner, of second-degree murder, MCL 750.317, being a felon in possession of a firearm (felon in possession), MCL 750.224f, and possessing a firearm during the commission of a felony (felony-firearm), MCL 750.227b. The facts underlying his convictions do not bear on the current question before this Court. On August 30, 2001, the circuit court sentenced defendant as a third offense habitual offender, MCL 769.11, to concurrent prison terms of 25 to 50 years for the murder conviction and 2 to 10 years for the felon in possession conviction and a consecutive term of 5 years for the felony-firearm conviction. On direct appeal, defendant challenged several of the circuit court's evidentiary rulings, but did not raise the present issue. The

2

Court of Appeals affirmed his convictions and sentences.[1]  This Court denied

defendant's subsequent application for leave to appeal.[2]

In 2004, defendant sought relief from judgment under MCR 6.501 *et seq*.

He argued that his appointed trial and appellate attorneys had provided

constitutionally ineffective representation because they failed to investigate and

challenge the two prior convictions underlying his third offense habitual offender

status.  For purposes of the habitual offender enhancement, defendant had

stipulated at trial prior convictions of felonious assault and felony-firearm.  In his

motion for relief from judgment, defendant claimed that both of those convictions,

for which he had been sentenced on February 25, 1988, arose from the same

criminal act.  Accordingly, he asserted that the two convictions should have been

counted as a single prior felony conviction for purposes of applying the habitual

offender laws under *Stoudemire* and *Preuss*.  Thus, defendant argued that he

should have been sentenced only as a second offense habitual offender, MCL

769.10, and therefore would have been exposed to potentially shorter prison terms

for his murder and felon in possession convictions.  He also argued that he had

good cause for belatedly raising this issue in a motion for relief from judgment

under MCR 6.508(D)(3)(a) because his appellate attorney was constitutionally

ineffective for failing to recognize and raise the issue in defendant's prior appeal.

---

[1] *People v Gardner,* unpublished opinion per curiam of the Court of Appeals, issued April 13, 2003 (Docket No. 238186).

[2] 469 Mich 975 (2003).

3

The circuit court denied defendant's motion, opining that defendant had not established good cause for his failure to raise this issue in his prior appeal. The Court of Appeals denied defendant's application for leave to appeal "for failure to meet the burden of establishing entitlement to relief under MCR 6.508(D)."[3]

Defendant then applied for leave to appeal in this Court. We heard oral argument on whether to grant his application or take other peremptory action. We directed the parties to address whether *Preuss* and *Stoudemire* "correctly held that multiple convictions arising out of a single criminal incident may count as only a single prior conviction for habitual offender purposes and, if so, whether the defendant is entitled to be resentenced."[4]

## II. STANDARDS OF REVIEW

The primary question requires us to interpret Michigan's habitual offender statutes. This Court reviews de novo questions of statutory interpretation. *People v Buehler,* 477 Mich 18, 23; 727 NW2d 127 (2007). We also review de novo the ultimate constitutional question whether an attorney's ineffective assistance deprived a defendant of his Sixth Amendment[5] right to counsel. *People v LeBlanc*, 465 Mich 575, 579; 640 NW2d 246 (2002).

---

[3] *People v Gardner,* unpublished order of the Court of Appeals, entered July 10, 2006 (Docket No. 267317).

[4] 477 Mich 1096 (2007).

[5] US Const, Am VI.

## III. ANALYSIS

Defendant was sentenced as a third offense habitual offender under MCL 769.11, which reads, in pertinent part:

> *If a person has been convicted of any combination of 2 or more felonies or attempts to commit felonies*, whether the convictions occurred in this state or would have been for felonies or attempts to commit felonies in this state if obtained in this state, *and that person commits a subsequent felony within this state*, the person shall be punished upon conviction of the subsequent felony and sentencing under section 13 of this chapter as follows . . . . [MCL 769.11(1) (emphasis added).]

The same relevant language has appeared in each habitual offender statute[6] since 1978.[7] In 1987 and 1990, respectively, the *Stoudemire* and *Preuss* courts concluded that these statutes imply a same-incident or single-transaction method of counting prior felonies for purposes of sentencing enhancement. Accordingly, each predicate felony must "arise from separate criminal incidents." *Preuss, supra* at 717.

Habitual offender status may increase a defendant's minimum and maximum sentences.[8] The sentencing judge generally has the option to increase a

---

[6] MCL 769.10(1); MCL 769.11(1); MCL 769.12(1).

[7] See *Preuss, supra* at 720.

[8] Michigan has a primarily indeterminate sentencing scheme. For most crimes, courts impose both a minimum and a maximum sentence. The maximum sentence is set by statute on the basis of the sentencing offense. The recommended minimum sentence range is set by statutory guidelines that take into account the circumstances of the particular offense and offender. MCL 769.8; MCL 769.34; *People v Harper,* 479 Mich 599, 612-613; 739 NW2d 523 (2007).

repeat offender's maximum sentence.[9]  The high end of the statutory recommended minimum sentence range under the sentencing guidelines (the maximum minimum) also increases on the basis of the number of prior convictions.  Second offense, third offense and fourth offense[10] habitual offenders face increases in their maximum minimums of 25 percent, 50 percent and 100 percent, respectively.  MCL 777.21(3)(a) through (c).

Here, defendant would have been subject to a maximum penalty of life in prison for his second-degree murder conviction even without an habitual offender enhancement.  His unenhanced minimum sentence range—based on a prior record variable score of 20 and an offense variable score of 65—was 180 to 300 months.  MCL 777.61.  Because he was sentenced as a *third offense* habitual offender, MCL 769.11(1), he was subject to an enhanced minimum sentence range of 180 to 450 months (a maximum minimum of 300 months increased by 50 percent), MCL 777.21(3)(b).

Defendant argues that, under *Stoudemire* and *Preuss*, he should have been sentenced only as a *second offense* habitual offender, MCL 769.10(1), because his two prior felony convictions arose from the same criminal incident.  If he had been sentenced as a second offense habitual offender, his statutory minimum sentence

---

[9] MCL 769.10(1); MCL 769.11(1); MCL 769.12(1).

[10] MCL 769.12(1) establishes enhanced maximum sentences for offenders with three or more prior felony convictions.  For ease of reference, we call these offenders "fourth offense habitual offenders."

6

range would have been 180 to 375 months (a maximum minimum of 300 months increased by 25 percent). Although his 300-month (25-year) minimum sentence falls within the minimum sentence ranges for both second and third offense habitual offenders, as well as the enhanced range, defendant correctly argues that, if the circuit court relied on an inaccurate higher range when it imposed the sentence, resentencing would be required. *People v Francisco,* 474 Mich 82, 89-92; 711 NW2d 44 (2006).

The prosecution does not contest defendant's claim that his two prior felony convictions of felonious assault and felony-firearm arose from the same criminal incident. The prosecution also concedes that defendant may raise the issue in his current motion for relief from judgment because, *if Stoudemire* and *Preuss* correctly interpreted the habitual offender statutes, defendant has been prejudiced by the constitutionally ineffective assistance of his appointed trial and appellate attorneys.[11] The prosecution argues, however, that *Stoudemire* and

---

[11] Defendant's appointed attorneys did not raise the error at sentencing, in a motion for resentencing, or in a motion for remand in the Court of Appeals. Accordingly, defendant properly raises his argument in connection with a claim that he was denied his Sixth Amendment right to effective assistance of counsel. *Francisco, supra* at 90 n 8. An attorney is ineffective for Sixth Amendment purposes if his performance fell below an objective standard of reasonableness and the defendant was prejudiced as a result. *Strickland v Washington,* 466 US 668, 688, 692; 104 S Ct 2052; 80 L Ed 2d 674 (1984); *People v Pickens,* 446 Mich 298, 338; 521 NW2d 797 (1994). Any amount of additional prison time imposed as a result of an attorney's deficient performance has Sixth Amendment significance. *Glover v United States,* 531 US 198, 203; 121 S Ct 696; 148 L Ed 2d 604 (2001). Although we accord substantial deference to an attorney's strategic judgments, we can identify no strategic reason for the failure of defendants' attorneys here to

(continued…)

7

*Preuss* were incorrectly decided and that defendant was properly sentenced as a third offense habitual offender under the plain language of the statute. We agree.

Our goal in construing a statute is "to ascertain and give effect to the intent of the Legislature." *People v Pasha,* 466 Mich 378, 382; 645 NW2d 275 (2002). The touchstone of legislative intent is the statute's language. "If the statute's language is clear and unambiguous, we assume that the Legislature intended its plain meaning and we enforce the statute as written." *People v Weeder*, 469 Mich 493, 497; 674 NW2d 372 (2004). Accordingly, when statutory language is unambiguous, judicial construction is not required or permitted.[12] *Id.*

---

(…continued)
raise such an obvious point of error that increased the possible minimum prison sentence to which defendant was exposed. Therefore, defendant has properly stated a claim of ineffective assistance of counsel.

For the same reasons, defendant has also properly alleged good cause and actual prejudice, as is necessary to seek relief in a motion for relief from judgment. MCR 6.508(D)(3). A defendant may establish good cause for not raising an argument for relief sooner by showing that his appellate attorney rendered ineffective assistance by failing to raise the issue in a proper post-trial motion or first-tier appeal. *People v Reed,* 449 Mich 375, 378; 535 NW2d 496 (1995) (opinion by Boyle, J.). Appellate counsel's failure to "assert all arguable claims" or decision to "winnow out weaker arguments and focus on those more likely to prevail is not evidence of ineffective assistance." *Id.* at 391. Here, however, as noted, we cannot identify any excuse for counsel's failure to raise an obvious error that would have guaranteed resentencing under *Francisco*. Because the nature and strength of the argument are obvious, the omission is not evidence of a reasonable professional decision to winnow out weaker arguments.

[12]"[O]nly a few provisions are truly ambiguous and . . . a diligent application of the rules of interpretation will normally yield a 'better,' albeit perhaps imperfect, interpretation of the law . . . ." *Lansing Mayor v Pub Service Comm*, 470 Mich 154, 166; 680 NW2d 840 (2004). A provision is not ambiguous just because "reasonable minds can differ regarding" the meaning of the provision.

(continued…)

Here, the relevant language states that [i]f a person has been convicted of any combination of 2 or more felonies or attempts to commit felonies . . . and that person commits a subsequent felony within this state," the person shall be sentenced under the habitual offender laws.  MCL 769.11(1).  The text clearly contemplates the *number* of times a person has been "convicted" of "felonies or attempts to commit felonies."  Nothing in the statutory text suggests that the felony convictions must have arisen from separate incidents.  To the contrary, the statutory language defies the importation of a same-incident test because it states that *any combination* of convictions must be counted.  Indeed, *Stoudemire* and *Preuss* essentially acknowledged the clear import of the language.  Nonetheless, in each case, the Court explicitly ignored the text, turning instead to legislative history and the Court's own views regarding the intents of the New York and Michigan legislatures.[13]

---

(…continued)
*Id.* at 165.  "Rather, a provision of the law is ambiguous only if it 'irreconcilably conflict[s]' with another provision, or when it is equally susceptible to more than a single meaning."  *Id.* at 166 (citation omitted).  See *Klapp v United Ins Group Agency, Inc,* 468 Mich 459; 663 NW2d 447 (2003), for an example of truly ambiguous contractual language.

[13] Justice Archer vigorously dissented in *Stoudemire*, arguing that the clear statutory language did not impose or permit a same-incident test.  *Stoudemire, supra* at 282, 289 (Archer, J., dissenting).  Justice Archer observed that, since 1865, this Court has recognized a fundamental rule of statutory construction: "When the language used in a statute is plain and unambiguous, a common-sense reading of the provision will suffice.  No interpretation is necessary."  *Id*. at 280.  Justice Archer dissented in *Preuss* for the same reasons.  *Preuss, supra* at 743 (Archer, J., concurring in part and dissenting in part).

In 1987, the *Stoudemire* Court offered an initial interpretation of the relevant statutory language by observing that the original language of Michigan's habitual offender statutes, enacted by 1927 PA 175, was borrowed almost wholesale from New York's habitual offender statutes. *Stoudemire, supra* at 267. Accordingly, the Court referred to the remarks of the New York statutes' author, New York State Senator Caleb Baumes, who opined that the statutes were aimed at protecting the public from the professional criminal "'who has been convicted once, twice, three times, sentenced *and served his time* and come . . . out and resumed operations again . . . .'" *Id.* at 268, quoting Baumes, *The Baumes law and legislative program in New York,* 52 ABA Rep 511, 521 (1927) (emphasis added in *Stoudemire*). The Court concluded that New York courts had interpreted the New York statutes in keeping with Baumes's intent by establishing "that multiple convictions on the same day constitute only one 'conviction' for purposes of the habitual offender statute." *Stoudemire*, *supra* at 269, citing *People v Spellman*, 136 Misc 25; 242 NYS 68 (1930). The *Stoudemire* Court acknowledged, but rejected, other New York cases that conflicted with *Spellman*, concluding that "[t]hese opinions do not reflect awareness of the legislative intent clearly expressed by Senator Baumes" and observing that those courts' construction of the statutes had been superseded when the New York Legislature amended the statutes. *Stoudemire*, *supra* at 269 n 14.

The *Stoudemire* Court concluded:

> By borrowing New York's statute in its entirety, the Legislature indicated that it was motivated by the same purpose that underlay the New York statute. The Legislature intended that the habitual offender statute's fourth-felony provision, like the parallel provision in the New York statute, *should apply only to a person* who had had three opportunities to reform—*who had been convicted and sentenced and then subsequently committed another felony for which he was also convicted and sentenced, and then subsequent to the second conviction committed yet another felony, for which he was again convicted and sentenced.* [*Id.* at 271 (emphasis added).]

The Court also compared the intents of legislatures in other jurisdictions—as interpreted by courts in those jurisdictions—that had adopted methods for counting felonies based on whether the offenses grew out of the same occurrence, were committed on the same day, or were charged in the same indictment. *Id.* at 272-276. In accord, the Court held, consistently "with the legislative purpose underlying the habitual offender statute, that multiple convictions arising out of a single incident may count as only a single prior conviction for purposes of the statute." *Id.* at 278. The Court concluded that, to the extent that the statutory text read otherwise, the Court should focus on legislative intent in order to avoid absurdity, hardship, or injustice. *Id.* at 266-267.

Significantly, *Stoudemire* avoided the import of the statutory text, in part, by dismissing the Legislature's 1978 revisions of the text in 1978 PA 77. Before 1978, the relevant portion of MCL 769.11 stated: "A person who *after having been twice convicted* within this state of a felony or an attempt to commit a felony . . . commits any felony within this state, is punishable upon conviction as

11

[provided in this section]." (Emphasis added.)[14] Despite the revisions, the *Stoudemire* majority nonetheless relied on its perceptions of the history of the original 1927 act. The Court *explicitly recognized* that "the phrase 'If a person has been convicted of 3 or more felonies,' arguably has a different import than the phrase 'A person who after having been 3 times convicted . . . .'" *Stoudemire*, *supra* at 278. But the Court dismissed this significant change, concluding that "when considered in the context of the other changes made in the statute it is clear that the Legislature intended only to improve the statute's grammar, not to alter its underlying meaning." *Id.*[15]

In 1990, the *Preuss* Court refined the *Stoudemire* holding by clarifying that the prior offenses need not "be separated by intervening convictions or sentences," but it retained the rule "that a defendant's prior offenses must arise from separate incidents." *Preuss, supra* at 737. Specifically, by reference to the fourth offense habitual offender statute, the Court concluded that

> the statute does not require that a fourth offender's three prior convictions, the sentences for those convictions, or the offenses upon which those convictions and sentences are based, occur in any

---

[14] The change was consistent throughout the habitual offender laws. For instance, before 1978, MCL 769.12 similarly stated: "A person who *after having been 3 times convicted* within this state, of felonies or attempts to commit felonies . . . ." (Emphasis added.)

[15] Justice Cavanagh offers the puzzling assertions that "[t]here has been no change in the statutory language between 1940 and today that affects its inapplicability to 'different counts growing out of the same act,'" quoting *People v Podisad,* 295 Mich 541, 547; 295 NW 257 (1940), and that we "fail[] to identify the changes in the language that would have had this effect." *Post* at 5 n 6, 10.

12

particular sequence. *The statute requires only that the fourth offense be preceded by three convictions of felony offenses, and that each of those three predicate felonies arise from separate criminal incidents.* [*Id.* at 717 (emphasis added).]

*Preuss* criticized the *Stoudemire* Court's "flawed" interpretation of Michigan's statutes, concluding that the *Stoudemire* Court had erred in its attempt to divine the intent underlying the New York statutes on which Michigan's statutes were modeled. *Id*. at 720, 727-731. For instance, *Preuss* observed that *Stoudemire* had "relied erroneously on the only New York decision that held that a fourth offender's second and third offenses must each follow conviction and sentence on the earlier offense." *Id.* at 727. Further, the *Preuss* Court opined that Senator Baumes's comments did not establish his intent "on the issue of the sequentiality of prior convictions." *Id.* at 729. Perhaps most significantly, the *Preuss* Court observed that, to the extent that Baumes's views suggested "that the fourth offense must follow *a completed sentence*," his views "conflict[ed] with the language of 1927 PA 175, which literally requires only that the commission of the fourth offense follow three prior 'convictions,' not sentences." *Id.* at 730 (emphasis in original).

Thus, the *Preuss* Court acknowledged that the unambiguous statutory language—"If a person has been convicted of any combination of 3 or more felonies or attempts to commit felonies . . . and that person commits a subsequent felony"—refers only to the number of prior felony convictions and "implies that no particular sequence for the first three offenses or convictions was intended."

13

*Id.* at 720-721, 730. Nonetheless, the Court chose to disregard this language, opining that "a literal reading of a statute may be modified if that reading leads to a clear or manifest contradiction of the apparent purpose of the act, or if necessary to correct an absurd and unjust result . . . ."[16] *Id.* at 721. Accordingly, the Court "turn[ed] to sources of legislative intent other than the language to determine whether declining to read into the statute a sequentiality requirement for predicate offenses would contradict the Legislature's purpose in enacting the statute." *Id.* at 721.

In doing so, the *Preuss* Court erred when it construed the *unambiguous* terms of the statute by reference to legislative history. *Weeder, supra* at 497. Ironically, not only did it reject the *Stoudemire* Court's attempt at the same task,

---

[16] Justice Cavanagh incorrectly asserts that *Preuss* "found nothing in the amended language to compel a change in the longstanding requirement that 'multiple convictions arising out of a single incident may count as only a single prior conviction under the statute.'" *Post* at 11, quoting *Preuss, supra* at 720. To the contrary, both *Preuss* and *Stoudemire* recognized that the new language "arguably has a different import," *Stoudemire, supra* at 278, and "implies that no particular sequence for the first three offenses or convictions was intended." *Preuss, supra* at 721. But in each case, the Court avoided the plain meaning of the statutory text in favor of legislative history or on the basis of the Court's conclusion that the plain language of the text produced an absurd or unjust result. *Preuss, supra* at 721; *Stoudemire, supra* at 266, 271, 278.

There is no need to address the merits of the absurd results rule in this opinion. Even assuming the existence of such a rule of interpretation, the result reached here is by no means absurd. A reasonable lawmaker could easily have intended the result reached here. That is, such a lawmaker could easily have intended that courts count each separate felony conviction in determining habitual offender status. There is nothing at all absurd about treating a defendant who has been convicted of three felonies as a third offense habitual offender.

14

but its opinion highlights the problems inherent in such attempts by offering a different judicial construction of the inconclusive "history" of the very same enactments.[17] Further, *Preuss* failed to grapple at all with the import of the 1978 revisions, relying instead—just as the Court had in *Stoudemire*—on its impressions of the Legislature's intent when adopting the original 1927 language. On the basis of these impressions, *Preuss* concluded that the "legislative history of the statute suggests that it was directed at the 'persistent' or 'repeat' offender." *Preuss, supra* at 738. Having reached this conclusion, the Court then interpreted the statute as if these words appeared in its text, stating:

---

[17] Indeed, the *Preuss* Court itself proceeded to examine inconclusive statements from a report of the Commission of Inquiry Into Criminal Procedure. *Preuss, supra* at 721-722, citing State of Michigan, Report of the Commission of Inquiry Into Criminal Procedure (February 8, 1927). The Court noted the commission's desire to improve former repeat-offender statutes that imposed escalating punishments on the basis of preceding *punishments*. *Preuss*, *supra* at 722-723. The Court concluded that the commission's goals were to "make it tougher for criminals to avoid apprehension, conviction, and adequate punishment," to "apply [habitual offender enhancements] to a broader class of criminals than they would have applied to had the prior language about prior sentence been retained," and to "punish[] repeat offenders harshly." *Id.* at 724. Significantly, the Court acknowledged that the report "does not contain any express statement concerning the commission's intent regarding whether a defendant's prior convictions, offenses, or sentences must occur in any particular sequence in order for him to be subject to fourth-offender penalties." *Id.* at 722. Indeed, the new provision in its original 1927 form—which applied when an offender had been "three times convicted"—"literally applied to defendants who had previously been convicted three times before they committed their fourth offense, even if they had not yet been sentenced on any or all of those prior convictions." *Id.* at 724. Nonetheless, the Court cited the report, among other authorities, as evidence that the Legislature intended a same-incident test. *Id.* at 738.

15

A common-sense interpretation of these phrases is that the Legislature did not have in mind the person who had only one criminal episode in which he managed to commit several different crimes. Instead, "repeat" suggests some time interval between crimes, and "persistent" suggests a criminal who continues in his criminal pursuits after these intervals. Neither of these concepts may easily be reconciled with an interpretation of the statute which would allow a court to impose fourth-offender penalties on a defendant whose three prior convictions arose out of the same criminal incident. [*Id.*]

We reject the approaches of both *Stoudemire* and *Preuss*, which run counter to principles of statutory construction. Indeed, in criticizing *Stoudemire,* the *Preuss* Court *reinterpreted* the very history on which *Stoudemire* relied and reached a different result. Thus, these two opinions exemplify the problems inherent in preferring judicial interpretation of legislative history to a plain reading of the unambiguous text. As we have stated, construing an unambiguous statute by relying on legislative history "'[a]t the very most . . . allows the reader, with equal plausibility, to pose a conclusion of his own that differs from that of the majority.'" *Donajkowski v Alpena Power Co,* 460 Mich 243, 259; 596 NW2d 574 (1999), quoting *Rogers v Detroit,* 457 Mich 125, 164; 579 NW2d 840 (1998) (Taylor, J., dissenting), which was overruled by *Robinson v Detroit,* 462 Mich 439 (2000).[18] Further, "not all legislative history is of equal value . . . ." *In re*

---

[18] As perhaps best put by United States Supreme Court Justice Antonin Scalia,

[c]ommittee reports, floor speeches, and even colloquies between Congressmen . . . are frail substitutes for bicameral vote upon the text of a law and its presentment to the President . . . . It is at best dangerous to assume that all the necessary participants in the law-

(continued…)

16

*Certified Question,* 468 Mich 109, 115 n 5; 659 NW2d 597 (2003). Some historical facts may allow courts to draw reasonable inferences about the Legislature's intent because the facts shed light on the Legislature's affirmative acts. For instance, we may consider that an enactment was intended to repudiate the judicial construction of a statute, or we may find it helpful to compare multiple drafts debated by the Legislature before settling on the language actually enacted. Other facts, however, such as staff analyses of legislation, are significantly less useful because they do not necessarily reflect the intent of the Legislature as a body. *Id.* Shifting interpretations of the intent of the New York Legislature—particularly as embodied in the comments of a single state senator—certainly fall into this latter category.

Significantly, defendant here essentially concedes that a proper interpretation of the habitual offender statutes precludes the use of a same-incident method for counting prior convictions. Defendant merely advances policy considerations and suggests that the Legislature has acquiesced to the interpretations of the statutes offered by this Court in *Stoudemire* in *Preuss.* But, as with attempts at divining legislative intent from legislative history, "legislative

(…continued)

> enactment process are acting upon the same unexpressed assumptions. And likewise dangerous to assume that, even with the utmost self-discipline, judges can prevent the implications they see from mirroring the policies they favor. [*Thompson v Thompson,* 484 US 174, 191-192; 108 S Ct 513; 98 L Ed 2d 512 (1988) (Scalia, J., concurring) (citations omitted).]

17

acquiescence is an exceedingly poor indicator of legislative intent." *Donajkowski, supra* at 258. Instead, "sound principles of statutory construction require that Michigan courts determine the Legislature's intent from its *words,* not from its silence." *Id.* at 261; see also *People v Hawkins,* 468 Mich 488, 507; 668 NW2d 602 (2003) ("As we have repeatedly stated, the 'legislative acquiescence' principle of statutory construction has been squarely rejected by this Court because it reflects a critical misapprehension of the legislative process."). As we observed in *Donajkowski*, "'[c]ommentators have noted that one can posit myriad reasons explaining the Legislature's failure to correct an erroneous judicial decision . . . .'" *Donajkowski*, *supra* at 259, quoting *Rogers*, *supra* at 164 n 2 (Taylor, J., dissenting). Moreover, "'it should not be assumed that the Legislature even agrees it has a duty to correct interpretations by the courts that it considers erroneous.'" *Donajkowski, supra* at 260, quoting *Rogers, supra* at 164-165 (Taylor, J., dissenting). Indeed, as Justice Taylor observed, "'[i]n *Autio v Proksch Construction Co*, 377 Mich 517, 527; 141 NW2d 81 (1966), Justice Souris described [the doctrine of legislative acquiescence] as "a pernicious evil designed to relieve a court of its duty of self-correction" . . . .'" *Donajkowski, supra* at 260, quoting *Rogers, supra* at 165 (Taylor, J., dissenting). See *Donajkowski, supra* at 258-262, for a full discussion.[19]

---

[19] The dissenters would have us engage in a guessing game regarding the meaning of legislative silence. For instance, Justice Cavanagh notes that, before Congress amended 18 USC 924(e)(1) to explicitly include a same-incident test,

(continued…)

When the Legislature's language is clear, we are bound to follow its plain meaning. The Legislature is fully capable of amending statutory language if it sees fit to do so. Indeed, legislatures throughout the country have enacted habitual offender statutes that explicitly include same-incident methods for counting prior felonies. Arizona's habitual offender laws, for instance, explicitly provide: "Convictions for two or more offenses *committed on the same occasion* shall be counted as only one conviction for purposes of this section." Ariz Rev Stat Ann 13-604(M) (emphasis added).[20] The California Penal Code provides that "any person convicted of a serious felony who previously has been convicted of a serious felony . . . shall receive . . . a five-year enhancement for each such prior conviction *on charges brought and tried separately*." Cal Penal Code 667(a)(1) (emphasis added). The Illinois habitual offender laws offer a particularly helpful

---

(…continued)

courts had already begun grafting such a test onto the statute. *Post* at 9-10. But we rarely know whether a legislature's intent in amending a statute reflects the intent it originally had when it enacted the statute. Indeed, when a conforming amendment occurs in the wake of a judicial decision, for all we know, the judicial decision may have sparked debate because some legislators perceived the decision as error, but the legislature may ultimately have concluded that the incorrect interpretation nonetheless reflected the better current policy. For these reasons, we decline to second-guess the Legislature when it has spoken unambiguously. It is not this Court's role to correct judicially perceived mistakes rooted in the Legislature's silence or inaction. To the contrary, our separate duty is to engage in *self*-correction when appropriate. *Donajkowski, supra* at 260.

[20] See also Ariz Rev Stat Ann 13-604(S) ("A person who . . . stands convicted of a serious offense . . . , whether a completed or preparatory offense, and who has previously been convicted of two or more serious offenses *not committed on the same occasion* shall be sentenced to life imprisonment . . . .") (emphasis added).

19

comparison because the definition of habitual offender status includes general language somewhat similar to that in our own statutes:

> *Every person who has been twice convicted* in any state or federal court of an offense that contains the same elements as an offense now classified in Illinois as a Class X felony, criminal sexual assault, aggravated kidnapping or first degree murder, and is thereafter convicted of a Class X felony, criminal sexual assault or first degree murder, committed after the 2 prior convictions, *shall be adjudged an habitual criminal.* [720 Ill Comp Stat 5/33B-1(a) (emphasis added).]

The statute also *explicitly* provides, however, that "[a]ny convictions *which result from or are connected with the same transaction, or result from offenses committed at the same time*, shall be counted for the purposes of this Section as one conviction." 720 Ill Comp Stat 5/33B-1(c) (emphasis added).[21]

---

[21] Also compare Mo Rev Stat 558.016(3) ("A 'persistent offender' is one who has pleaded guilty to or has been found guilty of two or more felonies *committed at different times*." (emphasis added); 21 Okla Stat tit 21, § 51.1(B) ("Felony offenses relied upon shall not have arisen out of the *same transaction or occurrence or series of events closely related in time and location*." (emphasis added)); 18 USC 924(e)(1) (providing that under what was formerly titled the federal Armed Career Criminal Act, "[i]n the case of a person who violates [18 USC 922(g)] and has three previous convictions by any court referred to in [18 USC 922(g)(1)] for a violent felony or a serious drug offense, or both, *committed on occasions different from one another*, such person shall be fined under this title and imprisoned not less than fifteen years") (emphasis added).

These statutes exemplify other legislatures' use of plain language to establish same-incident tests. We note them in contrast to the text of Michigan's statutes. We do not "read positive meaning into Michigan legislative silence regarding, for instance, a Missouri statute," as Justice Cavanagh suggests. *Ante* at 9 n 10. Justice Cavanagh has it backwards. The Legislature has spoken through its plain language, which we seek to uphold. It is defendant and our dissenting colleagues who wish to import a same-incident test where there is none, assuming

(continued…)

20

For these reasons, we overrule *Stoudemire* and *Preuss*. "[S]tare decisis is not to be applied mechanically to forever prevent the Court from overruling earlier erroneous decisions determining the meaning of statutes." *Robinson v Detroit*, 462 Mich 439, 463; 613 NW2d 307 (2000). Rather, if a case was incorrectly decided, we have a duty to reconsider whether it should remain controlling law. *Id.* at 464. In doing so, we "review whether the decision at issue defies 'practical workability,' whether reliance interests would work an undue hardship, and whether changes in the law or facts no longer justify the questioned decision." *Id.* These criteria weigh in favor of overruling *Stoudemire* and *Preuss*.

Most significantly, the same-incident test has not created reliance interests that will be thwarted by overruling *Stoudemire* and *Preuss;* overruling these cases will not cause "significant dislocations" or frustrate citizens' attempts to conform their conduct to the law. See *id*. at 466-467. "[T]o have reliance the knowledge must be of the sort that causes a person or entity to attempt to conform his conduct to a certain norm before the triggering event." *Id.* at 467. The nature of a criminal act defies any argument that offenders attempt to conform their crimes—which by definition violate societal and statutory norms—to a legal test established by *Stoudemire* and *Preuss*. Moreover, to the extent that these cases implicate reliance interests, such interests weigh in favor of overruling them. Michigan citizens and

(…continued)
that the Legislature's silence in the wake of *Stoudemire* and *Preuss* signifies approval of the test those cases added.

21

prosecutors should be able to read the clear words of the statutes and "expect . . . that they will be carried out by all in society, including the courts." *Id.*

> In fact, should a court confound those legitimate citizen expectations by misreading or misconstruing a statute, it is that court itself that has disrupted the reliance interest. When that happens, a subsequent court, rather than holding to the distorted reading because of the doctrine of stare decisis, should overrule the earlier court's misconstruction. [*Id.*]

We also note that the factor of practical workability bears little on our decision to overrule our previous erroneous interpretations of the habitual offender laws. The Legislature's clear directive to count each felony is no less workable—and indeed is arguably simpler to apply in practice—than the current, judicially imposed same-incident rule.

## IV. RESPONSE TO THE DISSENTS

Justice Cavanagh concedes that our interpretation "may, arguably, be supported by the language of the habitual-offender statutes . . . ." *Post* at 5. But his arguments are rooted in his assertion that there are "competing, arguably plausible interpretations . . . ."[22] *Post* at 8-9. He then concludes that, because purported competing interpretations are possible, it is appropriate to consult legislative history and apply the rule of lenity. *Post* at 8-9. To the contrary, as we have explained and as defendant essentially concedes, there is nothing textually ambiguous about the Legislature's directive to apply habitual offender sentencing

---

[22] Justice Kelly similarly opines that "the language of the habitual offender statutes is at least equally supportive of the conclusion that the statues are inapplicable to multiple convictions arising from the same act." *Post* at 7-8.

laws when "a person has been convicted of any combination of 2 or more felonies or attempts to commit felonies . . . ." MCL 769.11(1).

In his only argument based on the text of the statute, Justice Cavanagh asserts that the statute's use of the phrase "subsequent felony" indicates that enhancement does not apply to simultaneous criminal acts. *Post* at 4-5.[23] We agree that, if an offender is convicted and sentenced for two simultaneous felonies, neither simultaneous conviction may be used to enhance the sentence for the other under the habitual offender statutes. But Justice Cavanagh's extension of this point to imply a same-incident test misinterprets the statute's use of the word "subsequent." "Subsequent" describes the sequential relationship between the sentencing felony and the prior convictions ("If a person has been convicted of any combination of . . . felonies or attempts to commit felonies . . . and that person *commits a subsequent felony. . . .*"). "Subsequent" does not describe a relationship *among* the prior convictions.

Justice Cavanagh also purports to rely on "this Court's consistent statements concerning the purpose of the habitual-offender statutes." *Post* at 6. He cites cases from 1929, the 1940s, and, most recently, 1970 and 1976. *Post* at 2, 5 n 6, and 6. Yet, as Justice Cavanagh acknowledges, the Legislature amended the statutes in 1978. 1978 PA 77. He ignores the import of the 1978 revisions, as did the Court in *Stoudemire* and *Preuss*. Thus, he urges that "in more than 150 years,

---

[23] Justice Kelly cites Justice Cavanagh on this point. *Post* at 8 n 24.

23

no Michigan court has ever held, until today, that convictions for multiple crimes committed in a single criminal transaction count as separate convictions for habitual-offender purposes." *Post* at 11-12, citing *People v Palm,* 245 Mich 396, 400; 223 NW 67 (1929). Justice Kelly similarly opines that the "1978 amendments did not alter the command that 'multiple convictions arising out of a single incident may count as only a single prior conviction under the statute . . . .'" *Post* at 8. But, instead of explaining this conclusory statement, she merely cites *Preuss*. *Post* at 8.

We reject the dissents' suggestions that this Court should divine legislative intent not from the Legislature's enactments, but from precedent of this Court that preexisted those enactments. Indeed, this Court addressed this very reasoning when we overruled *Dedes v Asch,* 446 Mich 99; 521 NW2d 488 (1994), in *Robinson*. We explained:

> The majority in *Dedes* interpreted the phrase "the proximate cause" to mean "a proximate cause." It did this on the basis of an analysis that not to do so would produce a marked change in Michigan law, and that the Legislature, in its "legislative history," gave no indication that it understood that it was making such a significant change. This approach can best be described as a judicial theory of legislative befuddlement. Stripped to its essence, it is an endeavor by the Court to use the statute's "history" to contradict the statute's clear terms. We believe the Court had no authority to do this. [*Robinson, supra* at 459-460.]

The Legislature has no duty to satisfy us that its legislative enactment is a "good" one. Legislation must be constitutional; this alone is enough. Once the Legislature has cleared the hurdle of constitutionality, we are to treat its enactment

24

as law.  When, as here, the text enacted by the Legislature and signed by the Governor is unambiguous, our duty is to uphold its plain meaning.

Both dissents' analyses would essentially require the Legislature to explain to this Court's satisfaction its reasons for changing the statutory text.  The Legislature has no such duty to us and, because its text is clear, it is irrelevant whether the legislators concluded that this Court misinterpreted the pre-1978 statutes in its previous decisions or, instead, that a new policy for counting prior felonies was preferable.  Significantly, various legislators' reasons for enacting the text may have differed and may have been rooted in either of these conclusions.  But their agreed-on choice of language is controlling.  If that language is perfectly forthright, our task is simply to implement it.  We reject the implications of the dissents' views, which would ultimately require the Legislature, when amending laws, to add redundant explanations for its otherwise plain language such as: "By X, we mean X.  We do not mean the Supreme Court's previous interpretations of Y."

We express no opinion regarding the correctness of any court's interpretations of the pre-1978 versions of the statutes.  Questions concerning earlier versions of the text are not before us.  Moreover, to whatever extent courts correctly divined past legislatures' intents using previously enacted language, those intents should not guide our interpretation of the *unambiguous* language of the current versions of the statutes; the acts of past legislatures do not bind the power of successive legislatures to enact, amend, or repeal legislation.  *Studier v*

*Michigan Pub School Employees' Retirement Bd,* 472 Mich 642, 660; 698 NW2d 350 (2005). In this case, we acknowledge the Legislature's explicit changes to the statutory language and, in doing so, by no means do we employ "a new view of statutory interpretation," as Justice Cavanagh contends. *Post* at 11 n 12. To the contrary, we consider the statute's plain language, and it is difficult to imagine how the Legislature could possibly have written the statute to more clearly indicate that all prior convictions count than by stating that "[i]f a person has been convicted of *any combination of* 2 or more felonies or attempts to commit felonies . . . and that person commits a subsequent felony within this state, the person shall be punished [as provided in this section]." MCL 769.11(1) (emphasis added).

Significantly, Justice Cavanagh's central contention is that the habitual offender statutes "are plainly intended to apply to habitual offenders, individuals who persist in criminal activity regardless of their prior convictions." *Post* at 1. But the goal of punishing persistent offenders by no means requires a same-incident test. Rather, the Legislature apparently and reasonably saw fit to punish an offender who has committed multiple prior felonies in a harsher manner than an offender who has committed only a single prior felony. We see no reason why the Legislature may not punish persistence by discriminating in a graduated fashion among those who have committed a single prior felony, MCL 769.10, those who have committed two prior felonies, MCL 769.11, and those who have committed three or more prior felonies, MCL 769.12, regardless of whether the offender committed the prior felonies on a single occasion. In sum, Justice Cavanagh's

26

analysis is fundamentally flawed because it offers a judicial construction to deconstruct an unambiguous statute. Nothing about the statute's text renders it susceptible to multiple interpretations and, therefore, judicial "construction" is not even permissible. Further, Justice Cavanagh repeats the mistakes of the Court in *Stoudemire* and *Preuss* by dismissing the 1978 revisions of the habitual offender laws and, instead, relying on debatable legislative history and court cases addressing the previous versions of the statutes.

Finally, Justice Kelly's exegesis of the doctrine of stare decisis misses the mark. As we have already discussed, the recent *Stoudemire* and *Preuss* decisions are not part of a long line of cases interpreting identical statutory language; rather, *Stoudemire* and *Preuss* purported to interpret the post-1978 language. Moreover, the *Stoudemire* and *Preuss* decisions are *themselves* inconsistent precedents. Justice Kelly would maintain *Preuss* as stare decisis because it is workable, free from absurdity, "not mischievous in practice," and no changes in the law or facts undermine it. *Post* at 11. But the same things can be said of *Stoudemire.* Accordingly, the heart of Justice Kelly's analysis contradicts her preference for *Preuss*, which itself overruled *Stoudemire* in part. Indeed, as we have thoroughly discussed, *Preuss* exemplifies the need for adhering to plain statutory language instead of upholding precedent merely for precedent's sake. The *Preuss* Court followed *Stoudemire* in choosing to avoid the plain statutory text. *Stoudemire, supra* at 278; *Preuss, supra* at 720-721. But *Preuss* then overruled *Stoudemire* in part after selectively reinterpreting other states' caselaw, comments by legislators,

27

and committee reports addressing the original 1927 Michigan act and the prior New York act. For these reasons, upholding *Preuss* certainly would not serve to "'avoid an arbitrary discretion in the courts . . . .'" *Post* at 2, quoting The Federalist No. 78, p 471 (Alexander Hamilton) (Clinton Rossiter ed, 1961). To the contrary, binding the Court to "strict rules"—such as the tenets of statutory interpretation—avoids arbitrariness.[24] *Post* at 2. Moreover, as we have explained, there is nothing "destabilizing" about today's decision under *Robinson* or otherwise. See *post* at 1, 3. No undue hardship will result because of reliance on our previous holdings, nor will we frustrate citizens' attempts to conform their conduct to the law. *Robinson, supra* at 464, 466-467. In the unlikely event that those who would commit additional felonies in this state laid plans for future crime in reliance on receiving less punishment than the plain language of the habitual offender statutes prescribes, Justice Kelly correctly assumes that such reliance garners little sympathy in our eyes. *Post* at 4 n 11.

## V. CONCLUSION

Michigan's habitual offender laws clearly contemplate counting *each* prior felony conviction separately. The text of those laws does not include a same-incident test. This Court erred by judicially engrafting such a test onto the

---

[24] Concerning Justice Kelly's criticisms of the majority for its supposed "disregard" for the doctrine of stare decisis, we reference the concurring statement of Justice Markman in *Rowland v Washtenaw Co Rd Comm*, 477 Mich 197, 223 (2007).

unambiguous statutory language. Accordingly, we overrule *Preuss* and *Stoudemire.*

Defendant was properly sentenced as a third offense habitual offender because he "ha[d] been convicted of . . . 2 or more felonies . . . and commit[ted] a subsequent felony within this state . . . ." MCL 769.11(1). Because defendant was properly sentenced, resentencing is not required on the basis of his claim that he received ineffective assistance of counsel. When an attorney fails to raise "an objection that would have been supported by a decision which subsequently was overruled," a defendant cannot show that he was prejudiced within the meaning of *Strickland. Lockhart v Fretwell,* 506 US 364, 366; 113 S Ct 838; 122 L Ed 2d 180 (1993). Under these circumstances, a focus on "mere outcome determination" is insufficient because the result of the proceeding is not fundamentally unfair or unreliable. *Id.* at 369. "To set aside a conviction or sentence solely because the outcome would have been different but for counsel's error may grant the defendant a windfall to which the law does not entitle him." *Id.* at 369-370, citing *United States v Cronic,* 466 US 648, 658; 104 S Ct 2039; 80 L Ed 2d 657 (1984).

Accordingly, we affirm defendant's sentences. We deny leave to appeal with respect to defendant's remaining issues because he has failed to meet the burden of establishing entitlement to relief under MCR 6.508(D).

> Maura D. Corrigan
> Clifford W. Taylor
> Robert P. Young, Jr.
> Stephen J. Markman

# S T A T E   O F   M I C H I G A N

## SUPREME COURT

PEOPLE OF THE STATE OF MICHIGAN,

     Plaintiff-Appellee,

v

No. 131942

CAPRESE D. GARDNER,

     Defendant-Appellant.

_____

WEAVER, J. (*concurring in result only*).

I concur with the result of majority opinion that defendant need not be resentenced. In this case, defendant did not suffer any material injustice. Any error in defendant's sentencing constituted harmless error.

                                    Elizabeth A. Weaver

# S T A T E   O F   M I C H I G A N

## SUPREME COURT

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

v                                       No. 131942

CAPRESE D. GARDNER,

      Defendant-Appellant.

_____

CAVANAGH, J. (*dissenting*).

This case considers the scope of Michigan's habitual-offender statutes, MCL 769.10, 769.11, 769.12, and 769.13. Because I believe this Court has, until today, properly understood legislative intent and properly applied the habitual-offender statutes to persons who persist in crime after having been convicted, I respectfully dissent.

The habitual-offender statutes, enhancing punishment for subsequent convictions, are plainly intended to apply to habitual offenders, individuals who persist in criminal activity regardless of their prior convictions. Defendant was sentenced under MCL 769.11(1) as a third-offense habitual offender. Defendant argues, and the prosecution does not contest, that the two underlying felonies supporting this sentence enhancement arose from the same criminal incident. In fact, there could not be a clearer case of felonies arising from the same criminal incident; the two prior convictions of possession of a firearm during the

commission of a felony and felonious assault arose from the very same act committed on April 11, 1987.

Applying both of these convictions as predicates for a third-offense habitual-offender sentence enhancement would be invalid under *People v Preuss*, 436 Mich 714; 461 NW2d 703 (1990), *People v Stoudemire*, 429 Mich 262; 414 NW2d 693 (1987), and the uniform holdings of this Court since the Legislature enacted the habitual-offender statutes in 1927.[1] *Preuss* held that, for purposes of the habitual-offender statutes, each of the predicate felony convictions must "arise from separate criminal incidents."[2] *Preuss,* 436 Mich at 717. *Preuss* affirmed the same holding found not only in *Stoudemire*, but also in *People v Podsiad*, 295 Mich 541, 547; 295 NW 257 (1940) (stating that the habitual-offender statutes are "inapplicable to convictions on different counts growing out of the same act"), and *People v Lowenstein*, 309 Mich 94, 100-101; 14 NW2d 794 (1944) (holding that multiple convictions from the same criminal transaction did not subject the defendant to additional punishment under the habitual-offender statutes). Clearly,

---

[1] The current habitual-offender statutes were enacted as 1927 PA 175. The relevant language was last amended by 1978 PA 77. However, in *People v Palm*, 245 Mich 396, 400; 223 NW 67 (1929), this Court observed that habitual-offender sentence enhancement was not "new" in this state; such statutes have been in force since 1857. This Court has never, until today, held that such statutes apply to multiple offenses committed on one occasion.

[2] *Preuss* specifically addressed MCL 769.12, the habitual-offender statute addressing three or more prior convictions, but that decision applies to all three statutes specifying sentence enhancements in the common scheme of the habitual-offender statutes.

2

the present defendant's two previous felony convictions, arising from the same act, do not arise from separate criminal incidents. Under *Preuss*, defendant would be subject to sentence enhancement as a second-offense habitual offender, not as a third-offense habitual offender.

The majority overrules *Preuss*. *Ante* at 2. The majority asserts that this Court has failed to understand the language of the habitual-offender statutes since such statutes were enacted and, thus, incorrectly failed to count multiple offenses toward habitual-offender sentence enhancement. I disagree.

The language of MCL 769.11(1), and the statutory system of which it is a part, indicates that the Legislature intended to require that predicate felonies for habitual-offender sentencing arise from separate criminal incidents. "It is elementary that statutes *in pari materia* are to be taken together in ascertaining the intention of the legislature, and that courts will regard all statutes upon the same general subject matter as part of 1 system." *Dearborn Twp Clerk v Jones*, 335 Mich 658, 662; 57 NW2d 40 (1953). MCL 769.10 is the first in a series of three statutes in the Code of Criminal Procedure that together allow enhanced penalties

on an increasing scale for an offender's second,[3] third,[4] and fourth[5] offenses. MCL 769.10 states that "[i]f a person has been convicted of a felony . . . and that person commits a *subsequent* felony," then that person is subject to a second-offense enhancement. (Emphasis added.) MCL 769.11 states that "[i]f a person has been convicted of any combination of 2 or more felonies . . . and that person commits a *subsequent* felony," then that person is subject to what is usually termed a third-offense enhancement. (Emphasis added.) Finally, MCL 769.12 states that "[i]f a person has been convicted of any combination of 3 or more felonies . . . and that person commits a *subsequent* felony," then that person is subject to what is usually termed a fourth-offense enhancement. (Emphasis added.)

This system of graduated enhancements for *subsequent* felonies clearly indicates that the Legislature did not intend habitual-offender sentence

---

[3] Section 10 of chapter IX of the Code of Criminal Procedure applies to a second offense and allows a sentence enhancement of no more than "1-1/2 times the longest term prescribed for a first conviction" of an offense otherwise punishable by less than life imprisonment. MCL 769.10(1)(a). See also MCL 777.21(3)(a).

[4] Section 11 of chapter IX of the Code of Criminal Procedure applies to a third or higher offense and allows a sentence enhancement of up to twice the longest term otherwise allowed for an offense punishable by less than life imprisonment. MCL 769.11(1)(a). See also MCL 777.21(3)(b).

[5] Section 12 of chapter IX of the Code of Criminal Procedure applies to a fourth or higher offense and allows a sentence enhancement of up to life imprisonment for offenses otherwise punishable by imprisonment for five years or more. MCL 769.12(1)(a). See also MCL 777.21(3)(c).

4

enhancement to apply to *simultaneous* criminal acts. As this Court long ago recognized, "[i]t is obvious that the [provisions of the habitual-offender statutes] relate to convictions for *subsequent* felonies. They apply only to persons who, after having been convicted of one felony, commit an additional crime, and are inapplicable to convictions on different counts growing out of the same act." *Podsiad*, 295 Mich at 546-547 (emphasis added).[6]

In this case, defendant could not have been sentenced as a second-offense habitual offender when he was first convicted of the two underlying crimes committed at the same time. But now, without intervening convictions, defendant has been sentenced as a third-offense habitual offender because of simultaneous, not subsequent, convictions. The majority interprets the habitual-offender statutes as applying to multiple, simultaneous convictions. While this interpretation may, arguably, be supported by the language of the habitual-offender statutes, this Court's longstanding, uniform interpretation is at least equally supported by the language of the statutes. I find the latter more convincing in light of the plain language of the habitual-offender statutes, the overall sentencing system prescribed by the Legislature, and legislative history.

---

[6] The majority disagrees that the graduated enhancement scheme of the habitual-offender statutes implies that they are "inapplicable to convictions on different counts growing out of the same act." *Podsiad*, *supra* at 547. But *Podsiad*, decided in 1940, demonstrates that this is hardly a novel understanding of the statutory scheme. There has been no change in the statutory language between 1940 and today that affects its inapplicability to "different counts growing out of the same act."

5

The requirement that predicate felonies arise from separate criminal incidents is supported by this Court's consistent statements concerning the purpose of the habitual-offender statutes. The statutes increase punishment because of a person's "'apparent persistence in the commission of crime . . . .'" *People v Hendrick*, 398 Mich 410, 416; 247 NW2d 840 (1976), quoting *People v Palm*, 245 Mich 396, 401; 223 NW 67 (1929). "The habitual criminal act was passed to provide a punishment for repeated commissions of felonies." *In re Southard*, 298 Mich 75, 78; 298 NW 457 (1941).[7] Obviously, persistence and repetition are not apparent when two convictions arise simultaneously from a single act.

This Court's statements on the legislative intent behind the habitual-offender statutes have relied, to one degree or another, on legislative history. The majority denounces legislative history as a means of statutory construction. The majority implies that, by use of legislative history, a statute can be made to say whatever its interpreter wishes it to say. *Ante* at 15-17. If this were so, one imagines the majority could marshal evidence from legislative history supporting

---

[7] See also *Palm*, 245 Mich at 401 (stating that the basis for sustaining the habitual-offender statutes is that "'the Legislature may require the courts to take into consideration the persistence of the defendant in his criminal course'") (citation omitted), *Lowenstein,* 309 Mich at 100-101 (stating that "the fact that defendant was convicted and sentenced on both counts" does not "result in conviction for two felonies such as to subject the defendant to additional punishment under the habitual criminal act"), and *People v Hatt*, 384 Mich 302, 306-307; 181 NW2d 912 (1970) (stating that the "only purpose of [the habitual-offender statutes] is to impose a longer sentence because of the apparent persistence by the defendant in the commission of acts of a criminal nature").

6

its interpretation of MCL 769.11. The majority cannot. Such evidence does not exist. The uniform evidence from legislative history supports the rule of *Preuss*, that crimes committed in a single criminal incident are counted as one for the purposes of the habitual-offender statutes.

The United States Supreme Court does not share the majority's dim view of consulting legislative history when there are competing, arguably plausible interpretations of a statute.[8] *Taylor v United States*, 495 US 575; 110 S Ct 2143; 109 L Ed 2d 607 (1990), is the seminal case interpreting the scope of what was formerly called the Armed Career Criminals Act (ACCA), specifically 18 USC 924(e), a federal analog of MCL 769.11 involving firearms offenses. In *Taylor*, the Supreme Court identified plausible alternative interpretations of the scope of certain statutory language in a particular provision of the ACCA. The Court then stated: "Before examining these [plausible, alternative interpretations], we think it helpful to review the background of [18 USC 924(e)]." *Id.* at 581. The Court then

---

[8] See, e.g., *Safeco Ins Co of America v Burr*, ___ US ___; 127 S Ct 2201; 167 L Ed 2d 1045 (2007) (extensively reviewing legislative history of the Fair Credit Reporting Act); *Ledbetter v Goodyear Tire & Rubber Co, Inc*, ___ US ___; 127 S Ct 2162; 167 L Ed 2d 982 (2007) (referring to legislative history of title VII of the Civil Rights Act of 1964). In *Wilkie v Robbins*, ___ US ___, ___; 127 S Ct 2588, 2606 n 12; 168 L Ed 2d 389 (2007), the Court stated that "we know that Congress patterned the [Hobbs] Act after two sources of law: 'the Penal Code of New York and the Field Code, a 19th-century model penal code.'" (Citations omitted.) This legislative history regarding the statutory sources offered insight to the Court, just as it did for this Court in *Stoudemire* (likewise reviewing the background of Michigan habitual-offender laws adapted from the New York penal code).

7

conducted a rigorous review of legislative history related to the statutory language in question. *Id.* at 581-590.

I agree with the United States Supreme Court: legislative history should not be ignored when it may illuminate a court considering reasonable, alternative interpretations of a statute. Where, as here, legislative history singularly supports one arguably reasonable interpretation of a statute over another, it is a worthy guide to the proper choice between the interpretations.[9] The former interpretation of MCL 769.11, given by this Court from the enactment of the law in 1927 to today, is reasonable. It is supported by the language of the statute. It is also uniformly supported by legislative history.

Further, when there are plausible, competing interpretations of a criminal statute, the rule of lenity should apply. "'[W]hen there are two rational readings of a criminal statute, one harsher than the other, we are to choose the harsher only when Congress has spoken in clear and definite language.'" *Scheidler v Nat'l Org for Women, Inc*, 537 US 393, 409; 123 S Ct 1057; 154 L Ed 2d 991 (2003), quoting *McNally v United States,* 483 US 350, 359-360; 107 S Ct 2875; 97 L Ed 2d 292 (1987). In other words, when there are two plausible meanings, the more

---

[9] While legislative history may support several legislative intentions directed toward those individuals targeted by the habitual-offender statutes—punishment, removal from society, or rehabilitation—there is no such diversity regarding the identity of the individuals to whom the statutes are meant to apply. Uniformly, the evident intent is to target habitual offenders, those who persist in criminal activity despite prior convictions.

lenient should apply when years of a person's life are at stake. The majority isolates a statute outside its clear statutory scheme to arrive at the harsher result. But even if the majority's interpretation is plausible, the rule of lenity should apply, and the rule of *Preuss*, expressing the consistent holdings of this Court, should stand.

The majority lists several statutes from other jurisdictions as examples of habitual-offender statutes with language clearly requiring that predicate felonies arise from separate criminal episodes.[10] *Ante* at 19-20 and nn 20-21. Among these is the ACCA, a federal habitual-offender statute, as mentioned. The majority notes that the federal statute contains express language stating that predicate felonies must be "committed on occasions different from one another . . . ." 18 USC 924(e)(1). What the majority fails to observe is that at the time the United States Supreme Court implied, and the United States Court of Appeals for the Eighth Circuit held, that predicate felonies used under federal habitual-offender statutes must be committed on occasions different from one another, *the statute did not expressly say that*. Rather, the courts reviewed legislative history

---

[10] The majority asserts that these statutes from other states indicate that the Michigan Legislature "is fully capable of amending its language if it sees fit to do so." *Ante* at 19. The majority would read positive meaning into Michigan legislative silence regarding, for instance, a Missouri statute, but refuses to do so in light of decades of settled Michigan law. The Michigan Legislature may well have remained silent because no Michigan court until today has ever held that multiple convictions arising from the same act count as multiple offenses for purposes of habitual-offender enhancement.

9

to conclude that this must be the meaning of the statute.  Congress amended the statute *after* the courts so held, and, in fact, Congress relied on the court rulings to so amend the statute.[11]

The majority repeatedly implies that changes in the statutory language have altered the habitual-offender statutes to the extent that they now apply to crimes committed during the same criminal transaction, but the majority fails to identify the changes in the language that would have had this effect.  That is because there are no such changes or language.  The 1978 statutory revisions relate to the time of conviction; they do not relate to the timing of the commission of the underlying crimes.

In *Preuss*, we reviewed the 1927 and the 1978 statutory language.  We concluded that the language, both before and after amendment, required only that the defendant have been convicted of a felony before commission of the crime for which the enhanced sentence was being imposed.  We revised *Stoudemire*'s holding that the sentence for a previous crime must have been completed before that crime could be used in counting predicate felony convictions.  Thus, analyzing MCL 769.12, we stated that the statute applies "to defendants who had previously been convicted three times before they committed their fourth offense,

---

[11] See *Petty v United States*, 481 US 1034 (1987), *United States v Petty*, 828 F2d 2 (CA 8, 1987), *United States v Petty*, 798 F2d 1157 (CA 8, 1986), and 134 Cong Rec S17360, 17370 (daily ed November 10, 1988).  For a history of this development, see also *United States v McElyea*, 158 F3d 1016, 1018-1020 (CA 9, 1998); *Stoudemire*, 429 Mich at 275-276.

10

even if they had not yet been sentenced on any or all of those prior convictions." *Preuss,* 436 Mich at 724. Yet we found nothing in the amended language to compel a change in the longstanding requirement that "multiple convictions arising out of a single incident may count as only a single prior conviction under the statute." *Id.* at 720.

The amended language does not relate to the timing of the commission of the underlying crimes; it relates only to the timing of the convictions for them. The majority does not show precisely how the amended language relates to the timing of the commission of previous crimes. The majority's overruling of a century and a half of Michigan jurisprudence is not based on the 1978 revisions.[12] Again, in more than 150 years, no Michigan court has ever held, until today, that

---

[12] It appears that the majority is driven by a new view of statutory interpretation, not by any change in the statute itself. Inasmuch as the majority's interpretation of the habitual-offender statutes is plausible, it would have been equally plausible under the 1927 version because neither the former nor the current language expressly addresses the timing of the underlying crime's commission. Addressing the application of arguably changing methods of interpretation, the United States Supreme Court recently stated:

> But even were we to posit for argument's sake that changes in interpretive approach take place from time to time, we could not agree that the existence of such a change would justify reexamination of well-established prior law. Principles of *stare decisis,* after all, demand respect for precedent whether judicial methods of interpretation change or stay the same. Were that not so, those principles would fail to achieve the legal stability that they seek and upon which the rule of law depends. [*CBOCS West, Inc v Humphries*, ___ US ___, ___; 128 S Ct 1951; 170 L Ed 2d 864 (2008).]

convictions for multiple crimes committed in a single criminal transaction count as separate convictions for habitual-offender purposes. See *Palm*, 245 Mich at 400.

The majority asserts that its ruling is "arguably simpler to apply in practice" than the longstanding same-incident rule." *Ante* at 22. While it may be true that it is easier to count multiple felonies than to discern whether prior convictions arose from a single criminal incident, that does not mean that the Legislature intended the habitual-offender statutes to apply in that manner. Further, the longstanding rule that convictions arising from the same incident be counted as one conviction for habitual-offender purposes has not proved difficult to interpret or particularly susceptible to judicial discretion.[13] The rule has been workable since the statutes were enacted.

The defendant in this case has been sentenced to imprisonment for five years as a second-offense felony-firearm offender. MCL 750.227b(1).[14] His

---

[13] I find the majority's concern regarding judicial discretion somewhat puzzling because, as the majority observes, the statutes themselves give courts and prosecutors broad discretion in when and how they apply. Giving notice of the intent to seek a sentence enhancement for a defendant who is an habitual offender is at the discretion of the prosecutor. See MCL 769.13(1). Imposing a sentence enhancement is discretionary for the sentencing court. See MCL 769.10(1)(a) and (b); MCL 769.11(1)(a) and (b); MCL 769.12(1)(a) and (b).

[14] MCL 750.227b(1)states that a

> person who carries or has in his or her possession a firearm when he or she commits or attempts to commit a felony . . . is guilty of a felony, and shall be imprisoned for 2 years. Upon a second conviction under this section, the person shall be imprisoned for 5

(continued…)

12

simultaneous crimes have been counted for purposes of extending his sentence. Defendant will spend years, if not a lifetime, in prison. But defendant should be subject to further sentence enhancement as a second-offense, not a third-offense, habitual offender. The habitual-offender statutes apply to subsequent, not simultaneous, felonies. The statutes are intended to enhance the sentences of persistent criminals, not multiple offenders. Defendant's 25-year minimum sentence is within the recommended minimum sentence range for a second-offense habitual offender, but, because the sentencing court incorrectly counted separate convictions arising from the same criminal incident, in fact arising from the same act, resentencing is required. *People v Francisco*, 474 Mich 82, 89-91; 711 NW2d 44 (2006). I would not overrule *Preuss* and the uniform holdings of this Court that *Preuss* represents. I would remand this case to the sentencing court for it to impose a sentence on defendant as a second-offense habitual offender.

Michael F. Cavanagh
Marilyn Kelly

---

(…continued)
years. Upon a third or subsequent conviction under this subsection, the person shall be imprisoned for 10 years.

STATE OF MICHIGAN

SUPREME COURT

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

v                                             No. 131942

CAPRESE D. GARDNER,

      Defendant-Appellant.

_____

KELLY, J. (*dissenting*).

This is another case in which the majority disregards the doctrine of stare decisis. I join Justice Cavanagh's well-reasoned dissent. I write separately to strongly disapprove of the majority's efforts to overturn all caselaw with which it disagrees, however destabilizing the effect may be. This is not a new area of contention among us. I have previously argued that the majority's willingness to overrule precedent weakens our legal system at its foundation.[1] Because of the importance of the issue, it warrants continuing attention.[2]

I agree with Justice Cavanagh that *People v Preuss* and its antecedents correctly held that "multiple convictions arising out of a single incident may count

---

[1] See, e.g., *Rowland v Washtenaw Co Rd Comm*, 477 Mich 197, 253-257; 731 NW2d 41 (2007) (Kelly, J., concurring in part and dissenting in part).

[2] See *Welch v Texas Dep't of Hwys & Pub Transportation*, 483 US 468, 494; 107 S Ct 2941; 97 L Ed 2d 389 (1987) (opinion of Powell, J.) ("[T]he doctrine of *stare decisis* is of fundamental importance to the rule of law.").

as only a single prior conviction under the statute . . . ."[3]  Obviously, I would not overrule that line of decisions.  Yet, aside from this basic disagreement, I am concerned that the majority's approach to the doctrine of stare decicis tends to turn it on its ear.  The majority correctly observes that stare decisis should not be mechanically applied to prevent the overruling of previous caselaw.  Then it errs by moving in the opposite direction.  In contravention of the purpose of the doctrine, it mechanically applies stare decisis to permit the overruling of every case it believes was incorrectly decided.

Stare decisis is short for *stare decisis et non quieta movere*, which means "stand by the thing decided and do not disturb the calm."  It has been a part of American jurisprudence since the country was founded.[4]  Alexander Hamilton wrote that to "avoid an arbitrary discretion in the courts, it is indispensable that they should be bound down by strict rules and precedents which serve to define and point out their duty in every particular case that comes before them . . . ."[5]  Early in the twentieth century, Justice (then-Judge) Cardozo wrote that the "labor of judges would be increased almost to the breaking point if every past decision

---

[3] *People v Preuss*, 436 Mich 714, 720; 461 NW2d 703 (1990).

[4] The doctrine can be traced back to medieval England.  Healy, *Stare decisis as a constitutional requirement*, 104 W Va L R 43, 56-62 (2001).  It assumed its modern form in the late eighteenth and early nineteenth centuries.  *Id.* at 55.

[5] The Federalist No. 78, p 471 (Alexander Hamilton) (Clinton Rossiter ed, 1961).

2

could be reopened in every case, and one could not lay one's own course of bricks on the secure foundation of the courses laid by others who had gone before him."[6]

The present majority on this Court has adopted what are commonly known as the "*Robinson* factors" to discern whether precedent should be overruled.[7] "In determining whether to overrule a prior case, this Court first considers whether the earlier case was wrongly decided."[8] But that is only the first step that must be taken. The Court must then examine (1) whether the decision remains workable, (2) the degree of reliance on the decision, and (3) whether changes in the law or facts have undermined the basis of the decision.[9] While this analysis appears straightforward, applying it can be difficult.

First, as demonstrated by the instant case, the justices of this Court often disagree about whether a previous decision was incorrectly decided. Yet, in this Court's post-*Robinson* cases, if a majority concludes that the previous decision was wrong, it will likely be overruled.[10] The remainder of the *Robinson* analysis

---

[6] Benjamin N. Cardozo, *The Nature of the Judicial Process* (New Haven: Yale University Press, 1921), p 149.

[7] *Robinson v Detroit*, 462 Mich 439; 613 NW2d 307 (2000).

[8] *Rowland*, 477 Mich at 214, citing *Robinson*, 462 Mich at 463-468.

[9] *Robinson*, 462 Mich at 464.

[10] See, e.g., *Rowland*, 477 Mich at 215 n 13 (stating that the *Robinson* factors did not counsel *against* overruling precedent); *Paige v Sterling Hts*, 476 Mich 495, 512 n 21; 720 NW2d 219 (2006) (stating that "the only instances in which we might *decline* to overrule [erroneous precedent]" is when doing so would produce chaos) (emphasis added); *People v Nutt*, 469 Mich 565, 591; 677 NW2d 1 (2004) (concluding that the Court is *compelled* to overrule erroneous

(continued…)

3

appears to be gratuitous. For instance, in the area of criminal law, the majority has

held that reliance interests simply are not implicated.[11] In addition, the majority

often merges the reliance prong with the initial determination of whether the

precedent was correctly decided. This last point effectively eviscerates the

reliance prong of the *Robinson* analysis, because a "wrong" decision supposedly

can never generate reliance.[12] The predictable result of the majority's current

approach is that, once a party meets its initial burden of demonstrating that a prior

decision was wrong, the precedent is overturned.

This result flies in the face of the doctrine of stare decisis. Key to the

doctrine is the concept that some precedent should be upheld notwithstanding its

---

(…continued)
precedent); *People v Hickman*, 470 Mich 602, 610 n 6; 684 NW2d 267 (2004) (noting that no special justification is necessary to overrule erroneous precedent); *People v Petit*, 466 Mich 624, 633-634; 648 NW2d 193 (2002) (stating that courts *should* overturn erroneous decisions).

[11] *Ante* at 21; see also *People v Kazmierczak*, 461 Mich 411, 425; 605 NW2d 667 (2000) (implying that reliance is not worthy of "sympathy" in the criminal context). The majority fails to recognize that criminals are not the only people who rely on criminal statutes. For instance, legislators appropriate funds for the Department of Corrections on the basis of predictions of how many individuals will be incarcerated. The majority's new interpretation of the habitual offender statutes could render previous calculations inaccurate and appropriations insufficient because criminals will now be subject to lengthier prison terms.

[12] See *Pohutski v City of Allen Park*, 465 Mich 675, 694; 641 NW2d 219 (2002), quoting *Robinson*, 462 Mich at 467 ("'[S]hould a court confound . . . legitimate citizen expectations by misreading or misconstruing a statute, it is that court itself that has disrupted the reliance interest. When that happens, a subsequent court, rather than holding to the distorted reading because of the doctrine of stare decisis, should overrule the earlier court's misconstruction.'").

4

flaws.[13] As stated by Justice Brandeis: "*Stare decisis* is usually the wise policy, because in most matters it is more important that the applicable rule of law be settled than that it be settled right."[14]

Relying on caselaw from the United States Supreme Court, many commentators suggest that there exists a hierarchy of precedents. Under this hierarchy, stare decisis applies differently to different areas of the law.[15] The

---

[13] See *Hubbard v United States*, 514 US 695, 716; 115 S Ct 1754; 131 L Ed 2d 779 (1995) (Scalia, J., concurring in part) (stating that the decision to overrule must be supported by "reasons that go beyond mere demonstration that the overruled opinion was wrong [otherwise the doctrine would be no doctrine at all]"); *Allied-Bruce Terminix Cos, Inc v Dobson*, 513 US 265, 283-284; 115 S Ct 834; 130 L Ed 2d 753 (1995) (O'Connor, J., concurring) (reiterating her view that the majority had been wrong in deciding the same issue in a previous case but joining the majority in this case because there was no special justification to overrule it); *Mathews v United States*, 485 US 58, 66-67; 108 S Ct 883; 99 L Ed 2d 54 (1988) (Brennan, J., concurring) ("I write separately only because I have previously joined or written four opinions dissenting from this Court's holdings that the defendant's predisposition is relevant to the entrapment defense. . . . Were I judging on a clean slate, I would still be inclined to adopt the view that the entrapment defense should focus exclusively on the Government's conduct. But I am not writing on a clean slate; the Court has spoken definitively on this point. Therefore, I bow to stare decisis . . . ."); *Scott v Illinois*, 440 US 367, 374-375; 99 S Ct 1158; 59 L Ed 2d 383 (1979) (Powell, J., concurring) ("Despite my continuing reservations about the *Argersinger* rule, it was approved by the Court in the 1972 opinion and four justices have reaffirmed it today. It is important that this Court provide clear guidance to the hundreds of courts across the country that confront this problem daily. Accordingly, and mindful of *stare decisis*, I join the opinion of the Court.").

[14] *Burnet v Coronado Oil & Gas Co*, 285 US 393, 406; 52 S Ct 443; 76 L Ed 815 (1932) (Brandeis, J., dissenting).

[15] See, e.g., Sinclair, *Precedent, super-precedent*, 14 Geo Mason L R 363, 368-370 (2007); Sellers, *The doctrine of precedent in the United States of America*, 54 Am J Comp L 67, 68-69, 84-85 (Supp, 2006); Eskridge, *Overruling*

(continued…)

5

hierarchy approach gives the greatest weight to statutory precedents.[16] It states that caselaw interpreting statutes should rarely be overturned because the Legislature is the appropriate branch of government to correct an erroneous interpretation.[17]

Even if one rejects the hierarchy approach, the overruling of precedent requires some special justification.[18] The current majority of the Michigan Supreme Court, however, has ignored this broadly acknowledged requirement.[19] While *Robinson* borrowed its analysis directly from federal law, it failed to incorporate the special-justification requirement that permeates that body of law.[20]

---

(…continued)

*statutory precedents*, 76 Geo L J 1361, 1362-1363 (1988); Barrett, *Statutory stare decisis in the courts of appeals*, 73 Geo Wash L R 317 (2005).

[16] *Neal v United States*, 516 US 284, 295; 116 S Ct 763; 133 L Ed 2d 709 (1996); *Patterson v McLean Credit Union*, 491 US 164, 172-173; 109 S Ct 2363; 105 L Ed 2d 132 (1989); *Illinois Brick Co v Illinois*, 431 US 720, 736; 97 S Ct 2061; 52 L Ed 2d 707 (1977); see also Fisher, *Statutory construction: Keeping a respectful eye on Congress*, 53 SMU L R 49, 51-52 (2000); Barret, 73 Geo Wash L R at 320-321 (2005).

[17] As stated by the United States Supreme Court: "Considerations of *stare decisis* have special force in the area of statutory interpretation, for here, unlike in the context of constitutional interpretation, the legislative power is implicated, and Congress remains free to alter what we have done." *Patterson*, 491 US at 172-173.

[18] *Id.*; *Arizona v Rumsey*, 467 US 203, 212; 104 S Ct 2305; 81 L Ed 2d 164 (1984); *People v Hickman*, 470 Mich 602, 617 n 6; 684 NW2d 267 (2004) (Kelly, J., dissenting); see also Note, *The unworkable unworkability test*, 80 NYU L R 1665, 1669-1670 (2005).

[19] See *Hickman*, 470 Mich at 617 n 6 (Kelly, J., dissenting).

[20] *Robinson*, 462 Mich at 463-464.

"The most significant aspect of this 'special justification' approach is that it requires more than a conviction that the challenged precedent was wrongly decided."[21]   Requiring a special justification also promotes predictability in the Court's application of stare decisis by making it more difficult to apply the doctrine selectively.

In the instant case, the majority overrules longstanding caselaw interpreting a statute without any special justification.  The majority simply concludes that the earlier caselaw was incorrectly decided, and, because the caselaw interpreted a criminal statute, no reliance interests are implicated.  According to the majority, the habitual offender statutes clearly apply to multiple offenses committed on one occasion.  As Justice Cavanagh explains, this contradicts more than 150 years of precedent.[22]

The majority claims that it relies on the 1978 amendment of the habitual offender statutes.  It refuses to comment on "the correctness of any court's interpretations of the pre-1978 versions of the statutes."[23]   Willful ignorance of prior caselaw does not make it disappear.  Contrary to the majority's assertion, the post-1978 language of the habitual offender statutes does not clearly apply to multiple offenses committed on one occasion.  Rather, the language of the habitual offender statutes is at least equally supportive of the conclusion that the statutes

---

[21] Note, 80 NYU L R at 1670 (2005).

[22] *Ante* at 2 n 1, 11-12.

[23] *Ante* at 24.

are inapplicable to multiple convictions arising from the same act. This is because they set out a "system of graduated enhancements for *subsequent* felonies . . . ."[24]

Accordingly, the 1978 amendments did not alter the command that "multiple convictions arising out of a single incident may count as only a single prior conviction under the statute . . . ."[25] Because the amended statutory language does not compel the result reached by the majority, it is appropriate to consider this Court's understanding of the preamendment statutory language. This long history should not be ignored simply because it does not suit the majority's analysis.

Nor is it illogical or inconsistent to stand by *Preuss* even though *Preuss* itself rejected, in part, *People v Stoudemire*.[26] *Preuss* held, contrary to some of the reasoning articulated in *Stoudemire*, that the habitual offender statutes did not require that a prior conviction be separated by intervening convictions or sentences.[27] However, *Preuss* specifically maintained *Stoudemire*'s holding that a defendant's prior offenses must arise from separate incidents.[28] Thus, *Preuss* and *Stoudemire* are controlling precedent on the point in issue.[29]

---

[24] *Ante* at 4.

[25] *Preuss*, 436 Mich at 720.

[26] *People v Stoudemire*, 429 Mich 262; 414 NW2d 693 (1987).

[27] *Pruess*, 436 Mich at 738-739.

[28] *Id.* at 436 Mich 737.

[29] Whether *Preuss* correctly rejected *Stoudemire*'s reasoning concerning the timing of the convictions is not at issue here.

8

The majority asserts that binding courts to a strict-constructionist view of statutory interpretation ensures that courts are not arbitrary in their decision-making. The majority's decision in this case belies that claim. The statutory language at issue does not necessarily lead to the conclusion reached by the majority. Nonetheless, the majority is willing to change a longstanding rule of law that conflicts with its interpretation. Frequently, fair-minded people will disagree about what the language of a statute requires. Just because a majority of the justices on this Court proclaims a statute free from ambiguity does not make it so. This is precisely why it is so important that something more than a notion that an earlier case was incorrectly decided should be required before precedent is overruled.

Stare decisis is not an ironclad mandate. Because justices sometimes err, it is appropriate for us to reconsider earlier decisions.[30] When we do so, however, stare decisis requires that we give those decisions thoughtful and thorough consideration before tossing them aside. Our decision about whether an earlier case must be overruled should be guided by more than a notion that the case was incorrectly decided.[31]

---

[30] See *Sington v Chrysler Corp*, 467 Mich 144, 184; 648 NW2d 624 (2002) (Kelly, J., dissenting).

[31] The majority relies on Justice Markman's concurring statement in *Rowland* to counter my argument that it too freely overturns precedent with which it disagrees. Justice Markman's primary assertion in *Rowland* was that our disagreement is less about our esteem for precedent than about the merits of the

(continued…)

In the matter before us, I would uphold *Preuss,* because it was correctly decided.  Moreover, the doctrine of stare decisis dictates that it be upheld.  *Preuss* remains workable, and no changes in the law or facts have undermined it.  No special circumstances exist indicating that it should be overruled.  Because *Preuss* interpreted statutory law, the Court should be especially hesitant to overrule it.  If

---

(…continued)

opinions being overruled.  *Rowland,* 477 Mich at 224.  He then cited opinions in which I agreed with the precedent that the majority overruled.  As I stated in *Rowland*, "[t]his amounts to little more than a circumstantial ad hominem logical fallacy."  *Id*. at 257 n 12 (Kelly, J., dissenting).

Whether I will support precedents with which I disagree is a question not often brought to light but one I regularly confront.  In recent years, I have frequently disagreed with the majority on the merits and resolution of issues presented to us.  Once I have been outvoted and dissent, I face whether to reiterate my dissent in future cases raising the same issues.  Often, I accede to the opinion of the majority.  For instance, I recently joined the majority opinion in *State News v Michigan State Univ*, __ Mich __; __ NW2d __ (Docket No. 133682, decided July 16, 2008), even though it cited *Michigan Federation of Teachers v Univ of Michigan*, __ Mich __; __ NW2d __ (Docket No. 133819, decided July 16, 2008), in which I dissented.  Also, in the past 10 years, I have voted to deny leave in cases too numerous to list based on decisions reached by the majority, despite my disagreement with those decisions.  This further indicates my frequent willingness to abide by and maintain precedents with which I disagree.

Contrary to Justice Markman's belief, our respective records demonstrate that our disagreements stem frequently not solely from our view of the merits of issues but from our differing esteem for stare decisis.  See *Rowland*, 477 Mich at 257 n 12 (Kelly, J., dissenting), citing Todd C. Berg, Esq., *Overruling Precedent and the MSC, The Justices' Scorecard*, Michigan Lawyers Weekly, <http://www.michiganlawyersweekly.com/subscriber/archives_FTS.cfm?page=MI/06/B060691.htm&recID=389963&QueryText=overruling%20and%20precedent%20and%20msc> (accessed December 22, 2006).

The majority's reference to Justice Markman's accusations in *Rowland* concerning my record and views should be seen for what it is, a red herring, a distraction from the main point: the majority is choosing to overrule longstanding precedent in this case, as in so many before it, for wholly inadequate reasons.

*Preuss* misinterpreted legislative intent, the Legislature can amend the habitual offender statutes to permit their application to multiple offenses committed on one occasion.[32]  *Preuss* is free from absurdity, not mischievous in practice, and is consistent with other adjudications of this Court.[33]  For these reasons, as well as those articulated by Justice Cavanagh, I dissent.

Marilyn Kelly

---

[32] For the reasons stated by Justice Cavanagh, I disagree with the majority's conclusion that the Legislature has amended the statutes to permit their application to multiple offenses committed on one occasion.  *Ante* at 10-11.

[33] *Rowland*, 477 Mich at 255 n 8 (Kelly, J., concurring in part and dissenting in part).